## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

**UNITED STATES OF AMERICA**

> **Plaintiff,**

**v.**                                              **CASE NUMBER: 2:05 CR 25**

**JEROME GARDNER**

> **Defendant.**

## SENTENCING MEMORANDUM

Comes now the defendant, by counsel, and files a Sentencing Memorandum for the purpose of supporting the legal objections to the Presentence Investigation Report (PSR) provided in writing to the U.S. Probation Officer on May 19, 2006.

**I.    Defendant's Background.**

Mr. Jerome Gardner was born on December 30, 1978 in Harvey, Illinois. A review of Mr. Gardner's background reflects a broken home in which his father left when he was an infant and his mother was addicted to drugs and living on the streets. After his parents practically abandoned him, Mr. Gardner resided with his grandmother beginning at the age of 13. As noted in the PSR, she explained that Mr. Gardner's mother suffered from severe drug abuse and all of her children were removed from her custody. Mr. Gardner and his seven siblings were a tremendous strain on his grandmother and the family in general. Furthermore, Mr. Gardner's grandmother reported that he had anger issues because his mother and father had basically

abandoned the family.  Mr. Gardner received counseling for his anger in school. However, he never forgave either of his parents.

Mr. Gardner has two children from a seven year relationship with a woman named Michoeal Johnson.  The children's names are Jemika Gardner (age 9) and Jemontay Gardner (age 6).  Although both of the children reside with Ms. Johnson in Harvey, Illinois, Mr. Gardner had daily contact with them prior to his incarceration in this case.  He has been very active in their upbringing.  By all accounts, Mr. Gardner was a very involved father who provided both emotional and financial support to his children.

A review of Mr. Gardner's criminal history reflects someone who had numerous brushes with law enforcement for low level felony and misdemeanor misconduct. However, his criminal history itself does not warrant a life sentence. The PSR found him to be in criminal history category III.  Mr. Gardner has no prior convictions for violent crimes except for one misdemeanor domestic battery conviction in the year 2000. Although he has been arrested and convicted on several occasions for possessing a controlled substance, these convictions did not involve distribution and are consistent with his own drug usage beginning when he was approximately 18 years of age.

Prior to his detention in this case, Mr. Gardner had used marijuana approximately three times per week since the age of 22.  He had also smoked marijuana on the date of his arrest.  Despite his documented drug addictions, Mr. Gardner never received any educational or treatment services for his documented drug problems.  Without question, this constitutes a tremendous failure on the part of the criminal justice system considering Mr. Gardner's extensive arrests for possession of controlled substances.

2

II.     **Procedural History and Legal Arguments Against the Imposition of a**

        **Mandatory Life Sentence.**

        The government has filed written notice to seek enhanced penalties at

sentencing pursuant to 21 U.S.C. § 851(a).  In its notice, the government has alleged

that Mr. Gardner was convicted on August 5, 1998 and September 17, 2001 in the

Circuit Court of Cook County, Illinois for possession of a controlled substance.  21

U.S.C. § 851 states that any defendant who has been convicted of a "felony drug

offense" may be subject to the enhanced penalties contained within the statute.

        The term "felony drug offense" has been defined as any offense that is

punishable by imprisonment for more than one year under any law of the United States

or a state that prohibits or restricts conduct relating to drugs.  (See 21 U.S.C. § 802

(44)).  This definition is much broader than other recidivist definitions used to increase a

defendant's sentence.  For example, the United States Sentencing Guidelines require

that a prior drug conviction have some element of distribution before a defendant will be

subject to increased punishment.  (See Sentencing Guideline 4B1.2.)  The Armed

Career Criminal Statute is also far more restrictive in terms of what prior drug

convictions will be used to increase a defendant's sentence.  Similar to the Sentencing

Guidelines, this statute defines a prior "serious drug offense" in a state jurisdiction as

involving some type of distribution and requires a maximum penalty of at least ten years

under the particular state law.   (18 U.S.C. § 924(e)(2) )

        An examination of Mr. Gardner's sentencing guideline range is instructive on how

unjust a life sentence would be in this case.  Without the statutory mandatory minimum

3

sentence, Mr. Gardner would be facing a sentencing guideline range of 188 to 235 months.  This range already takes into account the extraordinary difference between crack and powder cocaine that has been criticized by the U.S. Sentencing Commission. The range also takes into account the denial of a three point reduction under the sentencing guidelines since Mr. Gardner elected to exercise his constitutional right to a jury trial.  If the court were to sentence Mr. Gardner at the top of the guideline range, he would have received a 235 month sentence of imprisonment.  A 235 month sentence equates to approximately 19.5 years in prison.

III.     **21 U.S.C. § 851 Violates the Fifth and Sixth Amendments.**

21 U.S.C. § 851 allows the court, rather than the jury, to increase the defendant's sentence based upon judicial fact finding.  Specifically, the statute allows a judge to increase a defendant's sentence based upon prior convictions that have not been proven to a jury under a reasonable doubt standard as required by Sixth Amendment. Consequently, the defendant would affirmatively move the Court to convene a sentencing jury to protect Mr. Gardner's Sixth Amendment right to a jury. The statute also violates Mr. Gardner's Fifth Amendment right to Indictment by grand jury because the two prior alleged convictions that the government intends to rely upon to increase his statutory minimum sentence were not alleged in the Indictment.

In Almendarez-Torres, the United States Supreme Court exempted prior convictions from the Apprendi requirement. 523 U.S. 224, 118 S.Ct. 1219 (1998). However, the theoretical soundness of Almendarez-Torres' "prior conviction" exception to the Apprendi-Blakely rule has been unclear post-Booker.  Recently, in U.S. v.

4

Shepard, 544 U.S. 13, 125 S.Ct. 1254 (2005) the Supreme Court made several important attacks on the Almendarez-Torres exception.  The attacks include (1) limiting the scope of the Almendarez-Torres "prior conviction exception" to Jones-Apprendi, (2) hinting that the Almendarez-Torres "prior conviction exception" will be overruled soon, and yet (3) leaving Almendarez-Torres "prior conviction exception" alive, without much use or clarity.  The four Justices speaking for the Court in Shepard, who are sustaining the Almendarez-Torres "prior conviction exception," were the four dissenters in the Almendarez-Torres decision.

In 1998, the key fifth vote upholding the judicial fact-finding of a prior conviction, thus creating what is now the "prior conviction exception" to Jones-Apprendi, was Justice Thomas.  In Shepard, Justice Thomas provides insight on whether, as a member of the plurality, he still finds the Almendarez-Torres exception to be good law. He wrote in concurrence:

> "Almendarez-Torres ... has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that Almendarez-Torres was wrongly decided."  Shepard v. U.S., 544 U.S. 13,  27, 125 S.Ct. 1254 1264 (2005)

Consequently, innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule of Almendarez-Torres despite the fundamental "imperative that the Court maintain absolute fidelity to the protections of the individual afforded by the notice, trial by jury, and beyond-a-reasonable-doubt requirements." Harris v. United States, 536 U. S. 545, 581–582 (2002) (Thomas, J., dissenting).

Writing for the majority in Shepard, Justice Souter addressed the (a) scope of the prior conviction exception and (b) the concerns of its future validity.  He wrote:

"[T]he sentencing judge considering the ACCA enhancement would (on the Government's view) make a disputed finding of fact about what the defendant and state judge must have understood as the factual basis of the prior plea, and the dispute raises the concern underlying <u>Jones</u> and <u>Apprendi</u>:  the Sixth and Fourteenth Amendments guarantee a jury standing between a defendant and the power of the state, and they guarantee a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence.  While the disputed fact here can be described as a fact about a prior conviction, it is too far removed from the conclusive significance of a prior judicial record, and too much like the findings subject to <u>Jones</u> and <u>Apprendi</u>, to say that <u>Almendarez-Torres</u> clearly authorizes a judge to resolve the dispute." <u>Id</u>. at 1264 and 25.

Regarding the extension of <u>Apprendi</u> to prior convictions, Justice souter further

wrote in Footnote 5:

"The dissent charges that our decision may portend the extension of <u>Apprendi v. New Jersey</u>, [citation omitted] to proof of prior convictions, a move which (if it should occur) 'surely will do no favors for future defendants in <u>Shepard</u>'s shoes.' [citation omitted]  According to the dissent, the Government, bearing the burden of proving the defendant's prior burglaries to the jury, would then have the right to introduce evidence of those burglaries at trial, and so threaten severe prejudice to the defendant.  It is up to the future to show whether the dissent is good prophesy, but the dissent's apprehensiveness can be resolved right now, for if the dissent turns out to be right that Apprendi will reach further, any defendant who feels that the risk of prejudice is too high can waive the right to have a jury decide questions about his prior convictions." <u>Id</u>. at 1263 and 26.

Basically, Justice Souter explained that any fact that was not resolved by a prior

jury finding or admission of the defendant may not be used to increase the defendant's

sentence, unless submitted to a jury and proven beyond a reasonable doubt.  If there is

a significant factual dispute about the nature of the prior jury findings or if the

defendant's admission is unclear, this dispute must be resolved by a jury.  The <u>Shepard</u>

case follows a Supreme Court pattern of deciding a case on a minute issue and then

taking the case again to decide the final matter.  Based upon the foregoing, judicial fact

finding, on disputed prior convictions being used to enhance a defendant's sentence, is

clear error. 21 U.S.C. § 851 is constitutionally flawed and should not be relied upon by the court to increase Mr. Gardner's sentence.

**IV.    Mandatory Minimum Sentences Based Upon Facts Not Proven to a Jury or Admitted by the Defendant Are Per Se Unconstitutional.**

The application of a mandatory minimum life sentence in this case is unconstitutional because the court intends to rely upon disputed facts neither found by a jury or admitted to by the defendant.  The <u>Apprendi</u> rule should apply equally to facts that increase the minimum as well as the maximum sentence.  As Justice Thomas explained, "Whether one raises the floor or raises the ceiling it is impossible to dispute that the defendant is exposed to greater punishment than is otherwise prescribed." <u>Harris v. United States</u>, 536 U.S. 545, 122 S.Ct. 2406 (2002) (Thomas, J., dissenting).

Although the majority in <u>Harris</u> upheld the application of such mandatory minimum penalties, <u>Id</u>. at 567-68, the case was decided by a five to four vote, in which one of the five majority justices was Justice Breyer, who candidly acknowledged that this holding could not logically be squared with <u>Apprendi</u>.  Breyer nonetheless concurred in the result because he could not "yet accept" <u>Apprendi</u>'s rule. <u>Id</u>. at 569. Since Breyer's remedy opinion in <u>Booker</u> was predicated on the application of <u>Apprendi</u>'s rule to the federal guidelines, he presumably does now accept its rule. The continued vitality of <u>Harris</u>, therefore, appears doubtful.

In the instant case, the facts necessary for the application of the mandatory minimum penalty were not proven to a jury beyond a reasonable doubt, and defendant

did not admit to them.   In accordance with the Sixth Amendment right to jury trial, the

mandatory minimum penalty provision cannot be applied.


**V.      The Disparity Penalties Between Crack and Powder Cocaine Under 21
         U.S.C. § 841 Violates the Equal Protection Clause of the Fifth Amendment.**


A.  Understanding the Disparity.

        The federal criminal penalty structure for the possession and distribution of crack

cocaine is one hundred times more severe than the penalty structure relating to powder

cocaine. 21 U.S.C. § 841(b)(1)(A)(ii)(1994); 21  U.S.C. § 841(b)(1)(B)(ii)(1994).

Possession of five grams of crack cocaine carries the same penalty as the distribution

of 500 grams of powder cocaine. For example, a first time offender tried in a federal

court and found in possession of five grams of crack cocaine would be subject to a

mandatory felony sentence of at least five years in prison without parole.  A person

convicted of 50-499 grams of powder cocaine would face a maximum penalty of one

year in prison.  For someone like Mr. Gardner, the sentencing disparity widens after one

or two prior convictions.

        In its Special Report to Congress, the United States Sentencing Commission

pronounced that "federal sentencing data leads to the inescapable conclusion that

blacks comprise the largest percentage of those affected by penalties associated with

crack cocaine." U.S. Sentencing Commission Special Report to Congress: Cocaine and

Federal Sentencing Policy xi (1995) (issued after a review of cocaine penalties as

directed by Pub.L.No. 103-322, Sec. 2800006).  In 1994, 96.5% of those sentenced

federally for crack cocaine offenses were non-white. (See United States Sentencing

Commission, 1994 Annual Rep. 107 (Table 45) ). The Commission's 2000 Source of Federal Sentencing Statistics revealed that 84.2% of blacks were convicted of crack cocaine cases, as compared with 5.7% of whites.  While the Commission did not contend that the penalties are racially motivated, the Commission did state that the high percentage of blacks convicted of crack cocaine offenses is "a matter of great concern." Id. at xi, xii.

The Commission's concern was furthered by a study on federal sentencing policies which disclosed that "between 1986 and 1990 both the rate and average length of imprisonment for federal offenders increased for blacks in comparison to whites," and that the higher proportion of blacks charged with crack offenses was "the single most important difference [accounting for] the overall longer sentences imposed on blacks, relative to [other groups]." Douglas C. McDonald & Kenneth E. Carlson, "Sentencing in the Federal Courts: Does Race Matter? The Transition to Sentencing Guidelines, 1986-1990," Summary, at 13 (1993).

The Commission's conclusion was that "if legislation and guidelines were changed so that crack and powdered cocaine traffickers were sentenced identically for the same weight of cocaine, this study's analysis suggests that the black/white disparity in sentences for cocaine trafficking would not only evaporate but it would slightly reverse." Id. at 12.  Because the sentencing disparity is so heavily focused on crack/powder sentencing, the Sentencing Commission reported that revising this one sentencing rule would do more to reduce the sentencing gap between blacks and whites "than any other single policy change," and would "dramatically improve the

fairness of the federal sentencing system." United States Sentencing Commission, Fifteen Years of Guidelines Sentencing (Nov. 2003), at 132.

B.  Equal Protection Violation: Rational Basis Review.

Because a higher percentage of blacks compared to whites are sentenced in federal court under the crack cocaine penalties, Mr. Gardner argues that the 100:1 quantity ratio of powder cocaine to crack cocaine is racially discriminatory, thereby violating the equal protection guarantees of the U.S. Constitution.  The Equal Protection Clause requires that "all persons similarly circumstanced shall be treated alike." Plyler v. Doe, 457 U.S. 202, 216,  102 S.Ct. 2382 (1982) A "rational basis test" is applied where there is no indication of a suspect classification based on race, religion, or other constitutionally protected interest. Village of Arlington Hts. v. Metropolitan Housing Development Corp., 429 U.S. 252, 266, 97 S.Ct. 555 U.S.Ill., 1977. In addition, an equal protection violation can be established when a statute is facially neutral but applied in a racially discriminatory way.  Plyler v. Doe, 457 U.S. 497, 499, 102 S.Ct. 2382 (1982).

In Washington v. Davis, the Supreme Court promulgated the principle that although the Fifth Amendment's Due Process Clause contains an equal protection component prohibiting the United States from invidious discrimination, it does not follow that a law is unconstitutional solely because it has a racially discriminatory purpose. The Court held "disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." Washington v. Davis, 426 U.S. 229, 242 (1976) (race-based employment discrimination). Under appropriate circumstances, an inference of discriminatory purpose can be drawn from a statute's disproportionate impact upon a particular group and, as argued in dissent by Justice Marshall, may also

10

be inferred from the "inevitable or foreseeable impact of a statute." <u>Personal
Administrator of Massachusetts v. Feeney</u>, 442 U.S. 256, 279-81 (1979) (Marshall, J.
dissenting); <u>Village of Arlington Heights v. Metropolitan Housing Development
Corporation,</u> 429 U.S. 252 at 266 ("Sometimes a clear pattern, unexplainable on
grounds other than race, emerges from the effect of state action even when the
governing legislation appears neutral on its face.").

Most federal courts have not found racially discriminatory intent when deciding
equal protection challenges to crack cocaine penalties.  When the courts apply a
"rational basis review," they look at whether Congress and the Sentencing Commission
had a legitimate purpose for the different punishment accorded crack cocaine verses
powder cocaine and a rational belief that the challenged classification promotes that
purpose. <u>United States v. Frazier</u>, 981 F. 2d 92, 95 (3d Cir. 1992), <u>cert. denied</u>, 113 S.
Ct 1661 (1993).  Even if the legislature were aware that the statute would have a racially
disparate impact, the statute is not invalid if that awareness was not a causal factor in
its enactment. <u>Frazier</u>, 981 F.2d at 95; <u>Personal Administrator v. Feeney</u>, 442 U.S. 256,
279 (1979).

Applying the rational basis standard, federal courts generally have upheld the
100:1 quantity ratio because the distinction between crack cocaine and powder cocaine
for penalty purposes was not motivated by racial animus or discriminatory intent.
Instead, the courts find that the distinction stems from the legitimate congressional
objective of protecting the public against a new addictive narcotic that could be
distributed easily and sold cheaply. <u>United States v. Lawrence</u>, 951, F.2d 751,755 (7th

Cir. 1991), See also, Frazier, 981 F. 2d. 92 (3d Cir. 1992), cert. denied, 113 S. Ct. 1661

(1993); United States v. Cyrus, 890 F. 3d 1245, 1248 (D.C. Cir. 1989).

One of the few cases that recognized the background of racism in America

generally, and specifically noted the history of racism inherent in America's attempt to

control crime was United States v. Clary, 34 F. 3d 709 (8th Cir. 1994).  The court found

that equal protection analysis must consider unconscious racism by legislators.  As a

result, the court held that a crack sentencing law that burdens blacks disproportionately

is a "de facto suspect classification" that could be traced to unconscious racism.  Id. at

774-77.  Because the court found a suspect classification, it applied strict scrutiny,

which requires a compelling government interest and a law narrowly tailored to address

said interest.  Under this higher level of scrutiny, the court found the statute violated

federal equal protection guarantees.  Although the court applied strict scrutiny, it was

reversed by the Eighth Circuit. United States v. Clary, 34 F.3d 709 (8th Cir. 1994).  The

Eighth Circuit held that the district court did not address the question of whether

Congress acted with a discriminatory purpose because there was not enough evidence

to establish discriminatory intent.

The current standard for finding intent ignores that racism is often not the

decision-maker's cognizant motive.  Therefore, a remedy based on racial inequality

must not be dependent upon provable intentional conduct.  The intent standard allows

sophisticated or unknowing racists to craft language that masks racial intent and leaves

the discriminated persons without a legal argument.  If decision-makers can use

creative language to pursue unjust agendas, then creative solutions must be allowed to

challenge those actions.  Therefore, current equal protection analysis must not be

12

allowed to block creative solutions.  Arguably, creative solutions will increase the amount of equal protection claims brought into court.  However, given the racial implications of the current crack/powder sentencing law, it seems unjust to protect decision-makers to the severe detriment of one racial group (see statistics infra).

While the courts are hesitant to find Congress made the law with discriminatory intent, there are other avenues to discuss whether the statutes generally implicating the crack cocaine/powder cocaine disparity are constitutional.  To determine the constitutionality of the statute, the courts may look beyond Congressional intent and explore (i) whether Congress justified the mandatory minimum sentence for crack cocaine on accurate data and (ii) whether any domestic law and/or international treaty that Congress ratified creates a tension between the statute and another aspect of Congressional action (wrong words).

C.  Congressional Intent- King Pins v. Mules

Mandatory minimum sentencing laws force judges to deliver fixed sentences to individuals convicted of a crime, regardless of culpability or other mitigating factors. Federal mandatory drug sentences are determined based on three factors: the type of drug, weight of the drug mixture (or alleged weight in conspiracy cases), and the number of prior convictions. Judges are unable to consider other important factors such as the offender's role, motivation, drug dependance, and the likelihood of recidivism. Only by providing the prosecutor with "substantial assistance," (information that aids the government in prosecuting other offenders) may defendants reduce their mandatory sentences. This creates huge incentives for people charged with drug offenses to provide false information in order to receive a shorter sentence.

13

Although Congress intended mandatory sentences to target "king pins" and managers in drug distribution networks, the U.S. Sentencing Commission reports that only 5.5 percent of all federal crack cocaine defendants and 11 percent of federal drug defendants are high-level drug dealers. This is because the most culpable defendants are also the defendants who are in the best position to provide prosecutors with enough information to obtain sentence reductions - the only way to reduce a mandatory sentence. Low-level offenders, such as drug addicts, mules or street dealers, often end up serving longer sentences because they have little or no information to provide the government.

D.  Congressional Intent – Possession v. Distribution

Since Congress stated that mandatory minimum sentencing targeted distribution rather than possession, it is important to review whether crack cocaine has harsh penalties for distribution only or distribution and possession.  Congress created a mandatory minimum penalty for possession of crack cocaine, which the Sentencing Commission previously recommended repealing.   USSC supra, note 1; supra note 2. Under the relevant statute, 21 U.S.C. § 844, the five gram-five year mandatory minimum threshold quantity *for distribution* of crack cocaine also applies to *simple possession* of crack cocaine.  This unique mandatory minimum penalty for simple possession results in significantly disproportionate sentencing.  Under the current penalty structure, an offender who simply *possesses* five grams of crack cocaine receives the same five-year mandatory minimum penalty as an offender who distributes five grams of the drug – and the same mandatory minimum penalty as a serious trafficker of other drugs. Simple possession of any quantity of other serious drugs of abuse (meth, heroine, LSD, and

14

simple possession of less than five grams of crack cocaine), is punished under 21 U.S.C. § 844 by a maximum penalty of one year imprisonment with no mandatory minimum (for a first time offender). Therefore, the crack simple possession statute is anomalous in its treatment of crack cocaine relative to the distribution of other drugs, as well as in the structural "cliff" that occurs at the five gram threshold.

E. Congressional Intent Based on Inaccurate Statistics

When Congress considered the crack cocaine verses powder cocaine disparity, crack cocaine was a fairly new problem in the United States. USSC, supra note 1, at 122 (The Los Angeles Times was the first major media to mention crack in November 25, 1984). In retrospect, some of the information available to Congress proved not to be empirically sound. At the time it enacted the stiff crack cocaine penalties, Congress lacked accurate and abundant information regarding the crack cocaine and powder cocaine disparity and it had limited avenues to treat crack cocaine sentences differently than powder cocaine sentences.

Congress chose the avenue of mandatory minimum penalties to differentiate the two offenses. Dramatic changes have occurred since Congress acted on the perceived crack cocaine crisis. Booker negated the mandatory sentencing guidelines. The Sentencing Commission now advocates a 20:1 ratio to more accurately sentence crack cocaine verses powder cocaine based on likelihood of addiction. Because the 100:1 drug quantity ratio was based on incomplete statistics, Congress' blatant defiance to review new data and the Sentencing Commission's recommendation to change the ratio, it is probable that Mr. Gardner has been caught by a net that was originally cast too broad and that has not been corrected.

15

F.  Congressional Intent - Alleged Increase in Violence

The U.S. Sentencing Commission and the Department of Justice have both concluded that mandatory sentencing fails to deter crime. Congress originally considered cocaine base much more dangerous than powder cocaine and, therefore, those who trafficked crack cocaine warranted significantly higher punishment.  One example is Congress' use of a strong correlation between crack cocaine and violence. The Sentencing Commission's current evidence disproves Congress' assumption.  For example, in 2000, almost three-quarters (74.5%) of federal crack cocaine offenders had no weapon involvement.  Mr. Gardner falls into this category.  He did not have a weapon when he was arrested and he does not have a history of criminal violence.

G.  Underlying and Ignored Racial and Gender Discrimination

Furthermore, mandatory minimums have worsened racial and gender disparities and have contributed greatly toward prison overcrowding. Mandatory minimum sentencing is costly and unjust. Mandatory sentencing does not eliminate sentencing disparities; instead, it shifts decision-making authority from judges to prosecutors who operate without accountability. Mandatory minimums also fail to punish high-level dealers. Finally, mandatory sentences are responsible for sending record numbers of women and people of color to prison.  According to the nonprofit Drug Policy Alliance, the following statistics demonstrate the draconian impact of federal drug sentencing:

•  Prison Overcrowding More than 80 percent of the increase in the federal prison population from 1985 to 1995 is due to drug convictions.

•  Racial Injustice In 1986, the year Congress enacted federal mandatory drug sentences, the average federal drug sentence for African Americans was 11 percent higher than for whites. Four years later, the average federal drug sentence for African Americans was 49 percent higher.

16

•   Women Between 1986 and 1996, the number of women in prison for drug law violations increased by 421 percent. This led U.S. Bureau of Prisons Director Kathleen Hawk-Sawyer to testify before Congress, "The reality is, some 70-some percent of our female population are low-level, nonviolent offenders. The fact that they have to come into prison is a question mark for me. I think it has been an unintended consequence of the sentencing guidelines and the mandatory minimums."  www.drugpolicy.org/drugwar/mandatorymin/

H.  International Race Convention

Recently, human rights organizations both foreign and domestic are issuing

reports detailing abuses in American institutions. See e.g., reports of Human Rights

Watch, International Human Rights Law Group (now Global Rights); Amnesty

International USA; Penal Reform International; Lawyers Committee for Human Rights

(now Human Rights First). As a result, lawyers in federal cases are increasingly raising

legal challenges pursuant to various international treaties. See Sandra L. Babcock,

"International Law in Capital Cases" (Aug. 2003). In early 2006, the Justice Roundtable

and the American Bar Association petitioned the Inter-American Commission on Human

Rights to examine the issue of discriminatory impact on mandatory minimum sentences

in the U.S. criminal justice system.  This request resulted in the granting of a historic

hearing on March 3, 2006 where oral and written testimonies emphasized the

crack/powder sentencing disparity as one of the most flagrant examples of racially

discriminatory impact. See testimonies at www.sentencingproject.org.

The American Judiciary has integrated international law into domestic

jurisprudence.  For example, United States Supreme Court Justices Ginsburg, Breyer,

Stevens, and Kennedy have cited positively to international law in the context of death

penalty, affirmative action, and anti-sodomy laws.  Atkins v. Virginia, 536 U.S. 304

17

(2002) (prohibiting execution of the mentally retarded); <u>Grutter v. Bollinger</u>, 539 U.S. 306, 123 S.Ct. 2325 (2003) (upholding use of race in affirmative action); <u>Lawrence v. Texas</u>, 539 U.S. 558, 123 S.Ct. 2472 (2003) (striking down anti-sodomy laws).  In Justice Kennedy's 2003 address before the American Bar Association, he challenged the ABA to engage in public discourse that will help shape the political will to find more just solutions and humane policies to the inadequacies and injustices of our prison and correctional systems, finding "new ideas, new insights, and new inspiration." Anthony M. Kennedy, Associate Justice, Supreme Court of the United States, "Speech at the American Bar Association Annual Meeting," (Aug. 9, 2003; revised Aug. 14, 2003), <u>see</u> also, Nkechi Taifa, "The 'Crack/Powder' Disparity: Can the International Race Convention Provide a Basis for Relief?,' American Constitutional Society for Law and Public Policy (May 2006).

The Constitution does not provide a remedy to those affected by discriminatory sentencing because the Supreme Court has held that discriminatory intent receives rational basis review (legitimate purpose for punishment and a rational belief that the classification promotes that purpose).  Basically, because Congress never explicitly stated that the different mandatory minimum sentences were enacted with the intent to discriminate against black people, the statute is constitutional under current constitutional doctrine.  This legal process ignores the underlying racial discrimination that is statistically obvious.

While the United States Government continues to ignore unconscious discrimination, the international community will not.  The International Convention on the Elimination of All Forms of Racial Discrimination (ICERD) allows laws and practices that

18

have an "invidious discriminatory impact" to be condemned, regardless of intent,

reaching both conscious and unconscious forms of racism.  The Convention also affirms

that "[e]ach State Party shall take effective measures to review governmental, national

and local policies, and to amend, rescind or nullify any laws and regulations which have

the effect of creating or perpetuating racial discrimination wherever it exists." ICERD,

Part 2, Art. 1(c).  Also, Parties to the Convention are legally obligated to eliminate racial

discrimination within their borders and are required to enact whatever laws are

necessary to ensure the exercise and enjoyment of fundamental human rights free from

discrimination. Id. Therefore, since the United States government chose to recognize

that it ratified the ICERD, the barrier to relief for those convicted of mandatory minimum

sentences involving crack cocaine rather than powder cocaine should assist in the

eradication of racism in the U.S. criminal justice system.

     The United States ratified the ICERD in 1994, but it did so in its tradition of

ratifying human rights treaties with limiting reservations, understandings, and

declarations.  Most notably, the U.S. CERD ratification declared that the Convention will

not be self-executing and will not create rights directly enforceable in U.S. courts,

absent implementation of specific legislation. Encouragingly, the United States in its

ratification process did not specifically discuss any reservations regarding the

Convention's "effects" provisions, despite the fact that under current U.S. constitutional

law analysis, there is no affirmative duty to remedy de fact discrimination pursuant to

equal protection laws unless a party can establish discriminatory intent.  Even absent

implementing legislation that would directly enforce the treaty under U.S. law, one

commentator asserts that if international law were used to assist in interpreting

19

constitutional rights, "the right attains greater credence as one that has universal recognition."  Lisa Kline Arnett, Comment, "Death at an Early Age: International Law Arguments Against the Death at an Early Age: International Law Arguments Against the Death Penalty for Juveniles," 57 U. Cin. L. Rev. 245, 261 (1988).

Although a solution to racial discrimination regarding crack/powder sentencing is available to the Supreme Court, the judiciary is apprehensive to exercise its right to question Congressional intent.  ICERD language encourages judges to interpret equal protection analysis in light of the ICERD's clause abrogating laws with an invidious discriminatory effect, irrespective of proof of intent, enabling a higher standard of strict scrutiny to apply. In sum, the judicial branch must be challenged to take appropriate measures to ensure that U.S. laws, policies, and practices are in conformity with the dictates of the convention.

In conclusion, the disparate punishments between crack and powder cocaine pursuant to 21 U.S.C. § 841 violate Mr. Gardner's right to equal protection under the Fifth Amendment.

## VI.    Cruel and Unusual Punishment

In Solem v. Helm, 463 U.S. 277, 292 the United States Supreme Court set out a three-prong test for evaluating whether punishment is cruel and unusual under the Eighth Amendment.  The Court looked to (i) the gravity of the offense and the harshness of the penalty; (ii) the sentence imposed on other criminals in the same jurisdiction; (iii) the sentence imposed for the same crime in other jurisdictions."  Id. The Solem analysis, however, has been sharply criticized by a plurality in Harmelin v.

Michigan, 111 S. Ct. 2680, 2686 (1991) (plurality opinion), which stated that Solem was simply wrong; the Eighth Amendment contains no proportionality guarantee." Justice Kennedy, however, counseled in a concurrence that *stare decisis* required "adherence to the narrow proportionality principle that has existed in our Eighth Amendment jurisprudence for 80 years." Id. at 2702 (Kennedy, J. concurring).

In United States v. Walls, 841 F. Supp. 24, 31 (D.D.C. 1994), the district court held that the application of the 100:1 ratio constituted cruel and unusual punishment. The court refused to apply the statutory mandatory minimum and guideline sentences for crack cocaine to two defendants who were "bit players" in a narcotics conspiracy and whose sentences would have been increased by five and nine times, respectively over those for cocaine powder.

While the court's decision was overturned, Mr. Gardner would urge the Court to adopt similar logic and find that a life sentence in this case would violate the cruel and unusual punishment clause of the Eighth Amendment.


## CONCLUSION

Mr. Gardner requests that the Court impose a sentence of 235 months imprisonment and find, for all of the above reasons, that a mandatory minimum sentence of life is inconsistent with the U. S. Constitution.


Respectfully submitted,

Northern District of Indiana
Federal Community Defenders, Inc.

By:   s/Jerome T. Flynn
      Jerome T. Flynn
      219 Russell Street, 6th Floor
      Hammond, IN   46320
      Phone:  (219) 937-8020
      Fax:  (219) 937-8021

## CERTIFICATE OF SERVICE

I hereby certify that, on June 8, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/CM/ECF system which sent notification of such filing to the following:

David J Nozick
David.Nozick@usdoj.gov

Thomas S Ratcliffe
Tom.Ratcliffe@usdoj.gov

and I hereby certify that I have mailed the document by U.S. Postal Service to the following non CM/CM/ECF participants:


 s/ Jerome T. Flynn


22